UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RICHARD PAYNE,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 1:25-CV-01842-PAG<br><br>JUDGE PATRICIA A. GAUGHAN<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Richard Payne challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Sept. 4, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision denying DIB and SSI.

## PROCEDURAL BACKGROUND

This is the second time Mr. Payne's claim for benefits is before this court. On August 20, 2020, Mr. Payne applied for DIB and period of disability benefits, alleging disability beginning June 12, 2020 due to a traumatic brain injury/hematoma, short-/long-term memory loss, bipolar disorder, post-traumatic stress disorder (PTSD), tinnitus, depression, left-ear deafness, vascular issues, back pain from broken vertebrae, and vertigo. (Tr. 145, 63). After his claim was denied

initially and on reconsideration, Mr. Payne requested a hearing before an administrative law judge. (Tr. 87, 98, 102). On August 24, 2022, Mr. Payne (without the aid of a representative) and a vocational expert (VE) testified before the ALJ. (Tr. 38-62). On December 7, 2022, the ALJ determined Mr. Payne was not disabled. (Tr. 21-33). On October 16, 2023, the Appeals Council denied Mr. Payne's request for review. (Tr. 1-3). Mr. Payne then sought review in this court. (Tr. 717-18; *see also* ECF #1, *Payne v. Comm'r of Soc. Sec.*, Case No. 1:23-cv-2398 (N.D. Ohio Dec. 18, 2023)). Mr. Payne and the Commissioner jointly stipulated to remand the ALJ's decision with instructions to hold a new hearing and issue a new decision. (Tr. 719).

While the proceedings on remand were pending, Mr. Payne applied again for DIB in December 2023 and also applied for SSI in April 2024. (Tr. 818, 825). After those claims were denied on initial review, they were consolidated with Mr. Payne's 2020 claim for DIB for an administrative hearing before the ALJ. (Tr. 722-23, 746). On April 9, 2025, Mr. Payne (now represented by counsel) and a VE testified before the ALJ. (Tr. 668-91). On June 16, 2025, the ALJ again found Mr. Payne was not disabled (Tr. 609-27). Mr. Payne did not file exceptions to the Appeals Council, nor did it assume jurisdiction within 60 days, so the second hearing decision is the final decision of the Commissioner. (*See* 20 C.F.R. §§ 404.984(d), 416.1484(d)). Mr. Payne timely filed this action. (ECF #1).

## Factual Background

### I. Personal and Vocational Evidence

Mr. Payne was 39 years old on the original application date and 43 years old at the second hearing. (*See* Tr. 75, 674). He completed 11th grade and previously worked as a cook and a kitchen helper. (Tr. 675-76, 685-86).

## II. Relevant Medical Evidence

Mr. Payne's medical records span more than 1,500 pages and document treatment for multiple medical and psychological conditions between February 2020 and February 2025. His arguments before this court challenge the analysis of his migraine headaches and residuals from his traumatic brain injuries as well as his mental health conditions. (*See* ECF #10 at PageID 2196-08). I thus discuss the record as it relates to those conditions.

### A. Migraine headaches and traumatic brain injury

Mr. Payne has a history of intermittent headaches stemming from three traumatic brain injuries (TBI). He sustained the first TBI during a 2004 motorcycle accident that also caused many broken vertebrae in his back and neck. (Tr. 538, 462). A 2020 MRI showed a "[s]mall left preseptal/left frontal scalp hematoma," "no intracranial hemorrhage or midline shift," and evidence of previous "left frontotemporal craniotomy." (Tr. 341). In January 2021, Mr. Payne experienced a headache during a consultative psychological evaluation that prevented him from participating fully and affected both his diagnostic scores and the final opinion. (Tr. 465, 468-71). In February 2021, Mr. Payne reported "constant headaches" to his psychiatrist. (Tr. 456). In March 2021, he complained of headaches every other day and he was prescribed propranolol for headache control and sumatriptan to treat breakthrough headaches.[1] (Tr. 538, 540). By the end of March, he reported propranolol had helped and his headaches decreased in intensity, but not

---

[1] Propranolol is a beta blocker commonly prescribed to reduce blood pressure but is also used to treat migraine headaches. It is also referred to in the record under the brand name Inderal. *See Propranolol*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682607.html (last accessed Sept. 10, 2026).

Sumatriptan is a selective serotonin receptor agonist prescribed to treat the symptoms of migraine headaches. It does not stop migraine headaches nor reduce the frequency of headaches. It is also referred to in the record under the brand name Imitrex. *See Sumatriptan*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a614029.html (last accessed Sept. 10, 2026).

frequency. (Tr. 535). His dosage of propranolol was increased and he was also prescribed Elavil, both as an antidepressant and to help his migraines.[2] (*Id.*). The records of his next visit in May 2021 do not address his headaches, though they were listed under his active problems. (*See* Tr. 532-34).

Mr. Payne's headaches are next mentioned in the record in June 2023 when he suffered his second TBI. In June 2023, paramedics took him to the emergency room after he was assaulted and struck in the head multiple times. (Tr. 1585). A CT scan of his head "demonstrated a large acute left epidural hematoma with mass effect and accompanying skull fracture" and he was referred for neurosurgery. (Tr. 1591). Later treatment notes reported he underwent a "craniotomy in the posterior aspect of the head" that "removed [an] intracranial hematoma" though the treatment notes for that procedure are not in the record. (*See* Tr. 923, 950).

In July 2023, Mr. Payne complained of headaches and reported taking medications. (Tr. 923). He was diagnosed with post-traumatic headaches that month. (Tr. 950). In August, he reported an increase in headaches and that his Imitrex (brand-name sumatriptan) worked initially but wore off after about an hour and so his dosage was increased. (Tr. 1463). But by October 2023, he reported he "still had daily headaches and has not been on his regular sumatriptan or Inderal" (brand-name propranolol). (Tr. 921).

In December 2023, Mr. Payne suffered his third TBI. He was a passenger in a van that collided head-on with another vehicle, throwing him head-first through the windshield. (*See* Tr. 1723; *see also* Tr. 679-80). In January 2024, Mr. Payne reported daily headaches. (Tr. 2112). An

---

[2] Elavil is a brand name for amitriptyline, an antidepressant commonly prescribed to treat depression but also used to prevent migraine headaches. *See Amitriptyline*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682388.html (last accessed Sept. 10, 2026).

MRI of his brain taken that month found a "pattern is highly suspect for/consistent with traumatic brain injury/post-concussive type process." (Tr. 2097). In March, he complained he still experienced headaches and pressure across his face and he was restarted on propranolol and Elavil for headaches, as well as other conditions. (Tr. 919). Though in May, he reported about three headaches per week. (Tr. 1857). By June, he reported he "sometimes gets some he[ad]aches." (Tr. 901). In December, he reported his "migraines are also doing well." (Tr. 2069).

### B. Mental health conditions

Mr. Payne has a history of depression with suicidal ideation and anxiety. From May to December 2020, he saw a psychiatrist monthly and the resulting mental status examinations noted a depressed or anxious mood with otherwise normal findings. (Tr. 450, 453, 456, 459). Parallel to his mental health treatment in 2020, he also received inpatient treatment for symptoms of drug and alcohol abuse. (*See, e.g.*, Tr. 306, 271-73, 288).

In January 2021, Mr. Payne underwent a consultative psychiatric examination in connection with his first application for benefits. (Tr. 461-71). The examiner, Michael Faust, Ph.D., diagnosed him with PTSD, recurrent and severe major depressive disorder, and opioid and alcohol use disorders. (Tr. 468). Mr. Payne complained of being easily startled, anxious, frequent nightmares, panic attacks, depression, twice-weekly crying spells, sleep difficulties, headaches, racing thoughts, and irritability. (Tr. 464). In addition to medication, he reported being previously in counseling, but not recently. (Tr. 464).

At Mr. Payne's next psychiatry appointment in February 2021, his "[d]epression and anxiety [were] ongoing but stabilizing gradually on the current medication regimen." (Tr. 486). A mental status examination yielded fair-to-good findings. (*Id.*). Later in February and again in July,

Mr. Payne was noted to be "functioning at baseline" with "no recurrence of depressive symptoms." (Tr. 488, 583). By November 2021, he was doing "fairly well" with an improved mood and stability but occasional struggles with anxiety. (Tr. 1367). Around this time, Mr. Payne had been working as a chef. (*Id.*; *see also* Tr. 612).

The next mental health treatment records are from July 2023 when Mr. Payne went to the emergency room after attempting suicide when he was overwhelmed by personal crisis. (Tr. 928-29). Six weeks before, he had been assaulted and hospitalized for four days and then over the ensuing weeks, he lost his job, lost his apartment, his wife asked for a divorce, and his father had been verbally harassing him. (*See* Tr. 929). He also reported stopping taking medications in part because of a lapse in insurance coverage and because he was tired of taking medications. (*Id.*). He was restarted on medications, though they required some recalibration, and he worked with a therapist. (Tr. 935, 941, 942, 947, 948, 950). On discharge, he denied suicidal ideation, had good insight into his condition and the need for treatment, had a mild deficit in recent and remote memory, and had no deficit in attention or concentration. (Tr. 925).

After discharge, Mr. Payne enrolled in a residential substance addiction treatment program. (*See* Tr. 1375, 1502, 1515). He was prescribed medications, but they required tailoring the dosage to respond to worsening symptoms and last all day while limiting the side-effects. (*See* Tr. 1437, 1456 (adjusting medications for increased anxiety), 1463 (adjusting dosage due to wearing off early), 1470 (adjusting to reduce side effect of troubled sleep)). He also participated in counseling. (Tr. 1551-52, 1554). His mental status examinations noted a depressed mood some days but noted otherwise normal findings. (Tr. 1434, 1439, 1451). By late August, he reported

worsening depression and nightmares of suicidal ideation. (Tr. 1477, 1484). He was discharged at the end of August to a sober living facility. (Tr. 1532).

In September 2023, he presented again to the emergency room with suicidal ideation on the advice of his therapist to seek further evaluation and treatment after discussing those thoughts in a session. (Tr. 1639). On admission, he had a blunted affect and denied active suicidal thinking but endorsed constant passive suicidal thoughts. (Tr. 1641). He denied feeling worse than his discharge from the hospital in July and reported many of his medications had changed since then. (Tr. 1644). His medication dosages were reduced. (Tr. 1649). His mental status examinations noted an okay mood, fair attention and concentration, and poor insight and judgment into his conditions. (Tr. 1647). On discharge, he demonstrated a euthymic mood, made jokes, and had good insight and judgment, and no suicidal ideation. (Tr. 1657).

But Mr. Payne was readmitted later in September after he attempted suicide upon learning his wife was having an affair. (Tr. 1684). He reported a depressed mood, disturbed sleep, anhedonia, and auditory hallucinations. (*Id.*). After admission, he endorsed some symptoms of depression and had some difficulty acquiring all his medications. (Tr. 1690). A mental status examination noted his suicidal ideation became passive but it remained ongoing, a depressed mood, fair attention and concentration, and good insight and judgment. (Tr. 1688). He was discharged after his symptoms “markedly improved” with him taking his full medication regimen. (Tr. 1698). In October 2023, he returned to his doctor and demonstrated a normal mood and affect along with good judgment and insight. (Tr. 921-22).

In August 2024, Mr. Payne attended another consultative psychiatric examination in connection with his second application for benefits. (Tr. 2049-53). The examiner, Thomas Evans,

Ph.D., diagnosed Mr. Payne with unspecified depressive and anxiety disorders. (Tr. 2052). Mr. Payne reported being depressed on a daily basis with twice-weekly crying spells, but Dr. Evans did not observe signs of depression during the evaluation. (Tr. 2050). Mr. Payne also reported "unremitting" anxiety on a daily basis, endorsed various physical symptoms of anxiety, and denied experiencing panic attacks, but Dr. Evans did not observe signs of anxiety during the evaluation. (Tr. 2051). Mr. Payne reported taking his medications as prescribed, but that he only had counseling while in his sober living facility. (Tr. 2052). A mental status examination noted normal mood and affect, no hallucinations, and adequate judgment. (Tr. 2051-52).

## III. Relevant Opinion Evidence

### A. Opinions issued before the 2024 remand

On January 5, 2021, Mr. Payne underwent a consultative psychological examination with Michael Faust, Ph.D., in connection with his first disability application. (Tr. 461-71). Dr. Faust diagnosed Mr. Payne with PTSD, recurrent and severe major depressive disorder, opioid use disorder, and alcohol use disorder. (Tr. 468). Dr. Faust noted Mr. Payne would become frustrated and emotional when his memory or thinking were taxed and complained of increasing headache pain over the session that prevented administering the Wechsler Memory Scale. (Tr. 461, 468). Mr. Payne completed Wechsler Adult Intelligence Scale testing, though Dr. Faust considered his score invalid and lower than expected because of his headache pain. (Tr. 468). Mr. Payne scored "extremely low" on intelligence ability, scoring below the bottom 0.1 percentile of full-scale intelligence with an IQ of 49. (Tr. 467-68).

Dr. Faust opined Mr. Payne:

- "[C]an be expected to experience difficulty with understanding, remembering and carrying out instructions related to ongoing symptoms of depression and PTSD";

- Has "some limitations in persistence and work pace, particularly when frustrated, and he also demonstrates impairment in attention and concentration";

- Has "limitations regarding responding appropriately to supervision or to coworkers in an employment setting"; and

- Has "limitations in his ability to respond appropriately to work pressures in an employment setting."

(Tr. 468-70). Dr. Faust also opined Mr. Payne would be unable to manage his own finances. (Tr. 470).

On February 8, 2021, state agency psychological consultant Kristen Haskins, Psy.D., reviewed Mr. Payne's file, including Dr. Faust's examination report. (Tr. 70-72). First, Dr. Haskins opined Mr. Payne was moderately limited in his ability to remember locations, work-like procedures, and to understand and remember detailed instructions, but not otherwise significantly limited in understanding and memory. (Tr. 71). Dr. Haskins explained Mr. Payne can "perform simple, routine and repetitive tasks. 1-2 steps." (*Id.*). Second, Dr. Haskins opined Mr. Payne was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and complete a normal schedule without interruptions from psychological symptoms, but was otherwise not limited or not significantly limited in sustaining concentration and persistence. (*Id.*). Dr. Haskins explained Mr. Payne can "perform simple, routine and repetitive tasks in a setting that does not have fast-pace

demand[s]" but "[w]hen symptoms increase, he will occasionally need flexibility in work schedule, taking breaks, and pacing." (*Id.*). Third, Dr. Haskins opined Mr. Payne was moderately limited in his ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but he was otherwise not limited or not significantly limited in social interaction. (*Id.*). Dr. Haskins explained that Mr. Payne "should have no interactions with the public and only brief and superficial interaction with co-workers and with no tandem tasks involved." (*Id.*). Last, Dr. Haskins opined Mr. Payne was moderately limited in his ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others, but he was otherwise not limited or not significantly limited in adaption. (Tr. 72). Dr. Haskins explained Mr. Payne can "work in a setting where there are well-defined work goals and can carry out a simple routine despite minor changes in the work setting" but he "will need major changes explained beforehand and gradually implemented to allow [him] time to adjust to the new expectations." (*Id.*). On reconsideration review in June 2021, state agency psychological consultant Leslie Rudy, Ph.D., reviewed updated records and affirmed Dr. Haskins' findings. (Tr. 81-83).

**B. Opinions issued after the 2024 remand**

In connection with his second disability application, on August 22, 2024, Mr. Payne underwent a consultative psychological examination with Dr. Evans. (Tr. 2049-53). When describing Mr. Payne's limitations in understanding, remembering, and carrying out instructions, Dr. Evans noted:

> The claimant last completed the 11th grade. He was in regular classes throughout school. No formal cognitive testing was conducted during today's appointment. He

> had no difficulties understanding and answering questions posed during today's appointment. He would not appear to have any difficulties understanding and carrying out simple to moderately complex instructions in a workplace setting.

(Tr. 2052). When describing Mr. Payne's limitations in maintaining attention, concentration, persistence, and pace and in performing simple and multi-step tasks, Dr. Evans noted:

> The claimant stated that since his head injury he has had significant difficulties with long-and short-term memory. He did struggle somewhat recalling fairly simple information during the clinical interview. He performed poorly on the mental status examination. He stated that he had to quit his last job because he could no longer do it due to memory problems.

(*Id.*). When describing Mr. Payne's limitations in responding appropriately to supervision and to coworkers, Dr. Evans noted:

> The claimant reported that prior to his second head injury, he was always able to get along well with supervisors and coworkers. Since the last head injury, he is short tempered and argumentative. He was quite pleasant and cooperative during today's appointment.

(Tr. 2053). When describing Mr. Payne's limitations in responding appropriately to work pressures, Dr. Evans noted:

> The claimant reported ongoing suicidal ideation and appears to have poor coping skills. He stated that he contemplated checking himself in the psychiatric hospital last week due to suicidal ideation. He denied current plan or intent.

(*Id.*).

On August 31, 2024, state agency psychological consultant Joan Williams, Ph.D., reviewed Mr. Payne's file from after his case was remanded, including Dr. Evans's examination report. (Tr. 728-31, 739-40). First, Dr. Williams opined Mr. Payne was moderately limited in his ability to understand and remember detailed instructions, but not otherwise significantly limited in understanding and memory. (Tr. 730, 739). Dr. Williams explained Mr. Payne can "understand and remember simple, repetitive instructions in a work setting that can be learned after a short

demonstration." (*Id.*). Second, Dr. Williams opined Mr. Payne was moderately limited in his ability to carry out detailed instructions and to maintain attention and concentration, but not otherwise significantly limited in sustaining concentration and persistence. (*Id.*). Dr. Williams explained Mr. Payne can "sustain attention and concentration on simple, routine tasks in a work setting." (*Id.*). Third, Dr. Williams opined Mr. Payne was moderately limited in his ability to accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but he was otherwise not limited or not significantly limited in social interaction. (Tr. 731, 740). Dr. Williams explained Mr. Payne can "interact with coworkers and supervisors appropriately on a superficial basis regarding work-related activities" but he "is likely to engender irritation in others due to unreliability." (*Id.*). Last, Dr. Williams opined Mr. Payne was markedly limited in his ability to respond appropriately to changes in the work setting, but he was otherwise not limited or not significantly limited in adaption. (*Id.*). Dr. Williams explained Mr. Payne will "present as if unable to withstand external requirements and pressures." (*Id.*).

## IV. Relevant Testimonial Evidence

### A. First hearing

In the first hearing in August 2022, Mr. Payne was not aided by counsel. (Tr. 40). Mr. Payne was in a severe dirt bike accident when he was 23 where he broke all his vertebrae and suffered a hematoma. (Tr. 50). He lost his hearing in his left ear, which has rendered him unable to drive. (Tr. 50, 46). A "fake material" was placed into his skull as a result of the accident. (Tr. 48). He was left with nerve damage that has caused progressive degradation of his memory. (Tr. 50, 52). His memory loss affected his ability to hold down jobs. (Tr. 42). Similarly, in his daily life, he

would forget to do things, where things go in the house, or what was happening in books he was reading. (Tr. 51-52).

Mr. Payne explained he stopped looking for work because he was very depressed and full of anxiety. (Tr. 49). His depression saps his motivation as if there were a weight on him. (Tr. 53). Some days he does not get out of bed. (*Id.*). He has at times been suicidal, though one of his medications had worsened his suicidal thoughts. (Tr. 53). When he gets anxious, he will freeze up, his mind will "go blank," and he will "forget everything." (Tr. 56-57). His anxiety is brought on by stress, loud noises, or people speaking in the wrong tone. (Tr. 56).

**B. Second hearing**

In the second hearing on April 9, 2025, Mr. Payne was represented by counsel. (Tr. 668). Mr. Payne explained he cannot work because he cannot reach or bend; he struggles to stay motivated, on task, and focused; and he had been hospitalized multiple times for suicidal ideation. (Tr. 678). His depression and anxiety make him impatient, frustrated, and irritable, as well as cause difficulty sleeping. (Tr. 679, 683). He must write everything down and still struggles remembering tasks. (*See* Tr. 679). He last worked in 2024 preparing food in a hotel kitchen. (Tr. 676). He worked for about two to three weeks before his memory issues and pain while standing were too much for him. (*Id.*). He had done similar work in 2021, but quit for similar reasons. (*Id.*). His memory loss caused him to struggle to remember details of his work history in the hearing. (Tr. 677).

Mr. Payne has suffered three head injuries. The first was when he was in a dirt bike accident at age 23 and he broke his neck and almost all the vertebrae in his back. (*See* Tr. 679; *see also* Tr. 50). The second was in 2023 when he was assaulted near his apartment. (Tr. 679; *see also*

Tr. 1585). The third was also in 2023 when the transportation van of the treatment center he was in got into a head-on collision and he was thrown through the windshield. (Tr. 679; *see also* Tr. 1723). He suffered seven herniated and two bulging discs. (Tr. 680).

After the 2023 motor-vehicle accident, Mr. Payne had at least 12 cervical epidurals to treat back pain and the next step in his treatment plan is to have several nerve endings burned. (Tr. 677, 681). He also began using a cane to walk and to stand at all times, even if to step off a curb. (Tr. 681, 684). He also takes gabapentin for the pain, among other medications. (Tr. 682).

Mr. Payne treats his depression and anxiety primarily through medications from his primary care physician. (Tr. 678). He does make counseling appointments when he feels the need to talk to someone. (*See id.*; Tr. 683). His lack of transportation makes it difficult to keep regularly scheduled appointments. (Tr. 681). He reported his medication is helpful some, but not all, of the time and he has both good and bad days. (Tr. 679).

At the time of the hearing, Mr. Payne had been homeless for nine months. (Tr. 680). His daily activities thus involve a daily struggle to find where to stay and what to eat. (*Id.*). He relies on friends and family for transportation. (*See* Tr. 675). While he had a driver's license in the past, he did not have one at the time of the hearing because he could not afford the cost of reinstatement. (Tr. 675). He avoids going to grocery stores unless he absolutely must. (Tr. 682). Instead, he typically gets food from food banks. (Tr. 683). It is extremely difficult for him to walk day-to-day and short distances such as from the car to the room he used for the hearing. (Tr. 682). He estimated he could stand without his cane for a minute or two but he would have to hold onto something. (Tr. 684). He has not tried to lift weight due to pain but estimated he could lift five or ten pounds if he were lucky. (*Id.*).

## STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Payne had engaged in substantial gainful activity during 2021 and 2022, but otherwise had not worked since the date he claimed his disability began. (Tr. 612). At Step Two, the ALJ identified obesity, lumbar and cervical degenerative disc disease, varicose veins, anxiety, depression/bipolar disorder, PTSD, a substance use disorder, residuals from a 2004 TBI/status post-hematoma and frontotemporal craniotomy, and migraine headaches as severe impairments. (Tr. 613). At Step Three, the ALJ found Mr. Payne's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 613-16).

At Step Four, the ALJ determined Mr. Payne's RFC as follows:

> The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; should avoid unprotected heights and hazardous machinery; can tolerate no more than moderate noise level as defined in the SCO; can understand, remember, and carry out simple instructions; can make simple work-related decisions; cannot perform work requiring a specific production rate pace, such as assembly-line work, or an hourly production quota; can meet production requirements that allow a flexible and goal-oriented pace; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods; can deal with occasional changes in a routine work setting; can tolerate occasional interactions with supervisors and coworkers, but cannot interact with the general public as a job requirement; can tolerate superficial interactions with coworkers, defined as should not engage in tasks that involve arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others, and brief interactions, meaning no sustained communication or problem-solving; and no tandem tasks.

(Tr. 617). The ALJ concluded Mr. Payne could not perform his past work as a cook. (Tr. 625). At Step Five, the ALJ determined Mr. Payne could perform other work in the national economy,

including as a mail clerk, marker, and sorter. (Tr. 626). Thus, the ALJ concluded Mr. Payne was not disabled. (Tr. 627).

## Standard of Review

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a

"zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Mr. Payne argues the ALJ erred by omitting without explanation the limitations in medical opinions the ALJ found persuasive, applying an impermissible "sit and squirm" test, and improperly assessing his migraine headaches and TBI's at Step Three. (ECF #10 at PageID 2196, 2200, 2201).

### I. Whether the ALJ properly explained the omission of certain limitations in the psychological opinions.

Mr. Payne first argues the ALJ erred by not incorporating limitations contained in medical opinions the ALJ found persuasive and not explaining those omissions. (ECF #10 at PageID 2196-

99). The Commissioner responds that the ALJ properly rejected the consultative examiners' opined limitations, explained the basis for those rejections, and substantial evidence supports the ALJ's explanations. (ECF #12 at PageID 2226-31).

The ALJ must assess a claimant's RFC "based on all the relevant medical and other evidence" of record, including the medical opinions. *Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015) (quoting 20 C.F.R. § 416.945(a)(3)). But the ALJ does not have to recite the opinion "verbatim" in the RFC. *Id*. Nor must the ALJ incorporate every limitation from a medical source's recommendation, even if the ALJ finds that medical source persuasive. *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, at *3 (6th Cir. May 20, 2024). But "if the ALJ's 'RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted.'" *Id.* (quoting Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (July 2, 1996)) (alteration in original).

Specifically, Mr. Payne contends the ALJ omitted without explanation three limitations: he (1) could perform simple, routine, one-to-two-step tasks in a setting without fast pace demands and occasional flexibility in work schedule, breaks, and pacing for when his symptoms would increase; (2) could understand and remember simple, repetitive instructions, but it was likely that he would engender irritation in others due to unreliability; and (3) he would be expected to experience difficulty with understanding, remembering, and carrying out instructions and have some limitations in persistence and work pace. (*See* ECF #10 at PageID 2196-97).

Mr. Payne relies on *Kinney v. Comm'r of Soc. Sec.*, an unpublished Sixth Circuit case, to argue the ALJ "should incorporate the limitations set forth by a persuasive source or proffer an explanation as to why the opinion was not adopted." (ECF #10 at PageID 2199). In *Kinney*, the

Sixth Circuit reversed an ALJ's decision that found a medical opinion "consistent with and supported by the record as a whole" and "persuasive" but which omitted without explanation a limitation contained therein requiring flexible breaks. 2024 WL 2273365, at *5. The court determined that "although the ALJ was not required to incorporate the flexible break scheduling limitation, the failure to do so without explaining its omission warrant[ed] reversal" because the ALJ found the opinion persuasive. *Id.* at *9. But here the ALJ found the prior administrative findings from before the 2024 remand "mostly persuasive," Dr. Faust's consultative opinion "not fully persuasive," Dr. Evans' consultative opinion "not fully persuasive," and the prior administrative findings from after the 2024 remand "partially persuasive." (Tr. 623-25). Other district courts in this district have distinguished *Kinney* when the ALJ finds an opinion less than fully persuasive. *See, e.g.*, *Haahr v. Comm'r of Soc. Sec.*, No. 3:23-cv-2159, 2024 WL 5242214, at *4 (N.D. Ohio Dec. 30, 2024). Thus, the district court could reject Mr. Payne's argument as overreading *Kinney* to apply to opinions the ALJ partially rejected. But even were *Kinney* squarely applicable, the ALJ explained the reasoning for why the omitted limitations were not adopted.

**A. 2021 state agency opinion that Mr. Payne is limited to simple, routine, and one-to-two step tasks and he needs a flexible schedule when his symptoms increase.**

The first omission Mr. Payne raises is the state agency consultants in 2021 limited him to simple, routine, and one-to-two-step tasks and needing flexibility in his schedule when his symptoms increase. (ECF #10 at PageID 2196-97). During the state agency review conducted before the 2024 remand, state agency psychological consultants opined Mr. Payne can "perform simple, routine and repetitive tasks" with "1-2 steps" and "simple, routine and repetitive tasks in a setting that does not have fast-pace demand" but "[w]hen [his] symptoms increase, he will occasionally need flexibility in work schedule, taking breaks, and pacing." (Tr. 71, 81-83).

The ALJ analyzed that opinion as follows:

> . . . More specifically, state agency psychologists who reviewed this record in 2021 said the claimant had work-related mental limitations in general alignment with the mental limitations the undersigned assesses the claimant as having. These opinions are mostly persuasive because they are mostly internally supported and because they are mostly consistent with the evidence, and lack of evidence, concerning the claimant's mental functioning since June 12, 2020, including the evidence, and lack of evidence, referenced in this decision. Aside from suicidal ideation in the context of alcohol use, the claimant's mental status examinations were generally normal.
>
> That said, the undersigned has not adopted all the above-referenced state agency psychologists' opinions *in toto* including their description of the claimant as being able to perform one-to-two-step tasks. This is because such a description does not speak to the claimant's maximum abilities. In addition, Social Security rules do not speak about a claimant's ability to understand, remember, and apply information in terms of steps. Nor does the *Dictionary of Occupational Titles*. Consequently, the undersigned has again not adopted this source's wording as her own.
>
> * * *
>
> The above-referenced state agency psychologists also said the claimant would "occasionally need flexibility in work schedule, taking breaks, and pacing" when symptoms increased. These opinions are also vague because these sources did not indicate the frequency of times the claimant's symptoms increased since the June 12, 2020 alleged onset date, what symptoms they are referring to, and how many of these times the claimant "occasionally [would] need flexibility in work schedule, taking breaks, and pacing." More importantly, the record taken whole does not support the claimant would have needed "flexibility in work schedule, taking breaks, and pacing" since June 12, 2020 if he worked within the parameters of his assessed residual functional capacity, a fact supported by the evidence, and lack of evidence, referenced in this decision, including the fact the claimant engaged in substantial gainful activity in 2021 and 2022.

(Tr. 623-24) (cleaned up).

The ALJ explained why not all the limitations were adopted. First, to the ALJ, the wording of the one-to-two-step-task limitation was inapt because neither the Social Security rules nor the *Dictionary of Occupational Titles* "describe a claimant's ability to understand, remember, and apply information in terms of steps." (Tr. 623). Instead, the ALJ found Mr. Payne can "understand, remember, and carry out simple instructions" and "make simple work-related decisions." (Tr. 617).

Other courts in this district have accepted as adequate the explanation that the wording of simple tasks is more appropriate than a limitation to a specific number of steps. *See, e.g.*, *Briggs v. Comm'r of Soc. Sec.*, No. 1:24-cv-947, 2025 WL 1322659, at *20 (N.D. Ohio May 7, 2025), *report and recommendation adopted,* 2025 WL 2673390 (N.D. Ohio Sept. 18, 2025). Because the ALJ explained that "simple tasks" is, in the ALJ's view, more in line with Social Security terminology than a specific number of steps, the ALJ properly explained why the opinion was not adopted.

Second, the ALJ found the opined limitation that "[w]hen [Mr. Payne's] symptoms increase, he will occasionally need flexibility in work schedule, taking breaks, and pacing" both vague and unsupported by the record. (Tr. 624). Vagueness, or the failure to propose specific functional limitations, is a valid factor on which the ALJ may rely in assessing an opinion's persuasiveness. *See Quisenberry v. Comm'r of Soc. Sec.,* 757 F.App'x 422, 434 (6th Cir. 2018) (affirming the ALJ's conclusion the discounted opinion was "quite vague"). The ALJ found the opinion vague because the state agency consultants "did not indicate the frequency of times the claimant's symptoms increased . . . what symptoms they are referring to, and how many of these times" Mr. Payne would need additional flexibility. (*See* Tr. 624). Thus, the ALJ explained the limitation was not adopted in part because it was unclear when the additional limitation would apply to Mr. Payne and what it would precisely require.

The ALJ also found "the record taken [as a] whole does not support" the specific limitation for additional flexibility and breaks when Mr. Payne's symptoms worsen, even though the ALJ found the opinion overall was "mostly internally supported" by and "mostly consistent with the evidence." (Tr. 624, 623). Social security regulations require the ALJ to consider how much the record and the source's explanation supports an opinion. *See* 20 C.F.R. §§ 404.1520c(c)(1), (b)(2);

416.920c(c)(1), (b)(2). Mr. Payne argues the opinion was supported by and consistent with the records of his mental health diagnoses, psychiatric hospitalizations, and suicidal ideation. (ECF #10 at PageID 21987-98). But the ALJ also thought the opinion was not wholly unpersuasive but "*mostly* internally supported" and "*mostly* consistent." (Tr. 623) (emphasis added). So bolstering the opinion overall does not show the ALJ mis-evaluated the specific limitation at issue. And pointing to evidence that Mr. Payne was hospitalized (and unable to work at all) when his symptoms are worse does not show Mr. Payne could have worked despite those symptoms with the aid of added breaks and a flexible schedule. Because the ALJ explained that the limitation for added breaks and flexibility when Mr. Payne's symptoms worsen is both vague and not supported by the evidence, the ALJ adequately explained why that limitation was not included in the RFC.

**B. 2024 state agency opinion that Mr. Payne would engender irritation in others due to unreliability.**

The second omission Mr. Payne raises is the state agency consultants in 2024 opined he would have limitations in memory, persistence, work pace, and social interaction. (ECF #10 at PageID 2196-97). In the administrative process after the 2024 remand, the state agency psychological consultants opined that Mr. Payne can "understand and remember simple, repetitive instructions in a work setting that can be learned after a short demonstration" and can "interact with coworkers and supervisors appropriately on a superficial basis regarding work-related activities" but he "is likely to engender irritation in others due to unreliability." (Tr. 730-31).

The ALJ analyzed this opinion as follows:

> Finally, this record includes opinions about the claimant's residual functional capacity offered by a state agency psychologist who reviewed this record on August 31, 2024. According to this source, the claimant had a mental residual functional capacity generally in alignment with the assessed mental residual functional capacity. However, the psychologist found the claimant had marked limitation in adapting or managing oneself and found "[C]laimant will present as if unable to withstand

> external requirements and pressures." This limitation is not further defined and does not give function by function limitations. A marked limitation is not consistent with the record either. While the claimant was hospitalized in July 2023 after a head injury and, in the context of alcohol use and suicidal ideation, and reported suicidal ideation in the August 2024 consultative examination, the consultative examiner found the claimant capable of managing his own finances and having adequate insight and social judgment, which is not consistent with marked limitation in adapting or managing oneself. Further, mental status examination in May 2024 reflected good insight and judgment with normal mood and affect. This source's opinions are partially persuasive.

(Tr. 625) (citations omitted). By finding the state agency consultant opined Mr. Payne "had a mental residual functional capacity generally in alignment with the assessed mental residual functional capacity," the ALJ thought the opinion and the RFC did not conflict. The sole area of conflict the ALJ identified was in the area of adapting or managing oneself and the ALJ did not mention limitations in understanding and remembering instructions or social interactions.

The ALJ must only explain why an opinion was not adopted "if the ALJ's 'RFC assessment conflicts with an opinion from a medical source.'" *See Kinney*, 2024 WL 2273365, at *3 (quoting SSR 96-8p, 1996 WL 374184, at *7). But the ALJ need not recite the opinion "verbatim" in the RFC. *Reeves,* 618 F.App'x at 275. When the RFC "reflects the limitations" in an opinion, the ALJ need not provide further explanation for his reasoning. *Wilds v. Comm'r of Soc. Sec.*, No. 24-5504, 2025 WL 1001806, at *5 (6th Cir. Mar. 31, 2025). Thus, if RFC reflects the limitations in the opinion, the ALJ does not have to explain further.

The RFC and the 2024 prior administrative findings do not conflict in describing Mr. Payne's limitations in understanding and memory. The RFC finds, in relevant part, that Mr. Payne "can understand, remember, and carry out simple instructions." (Tr. 617). The 2024 prior administrative findings opined Mr. Payne "could understand and remember simple repetitive instructions." (Tr. 730-731, 739-740). Though the RFC does not require the instructions be

repetitive, the RFC does reduce the complexity of Mr. Payne's work by limiting him to making "simple work-related decisions." (Tr. 617). Thus, the RFC reflected the opinion's limitations in understanding and memory and the ALJ was not obligated to explain further. *See Wilds*, 2025 WL 1001806, at *5.

Next, the RFC does not contain a specific social limitation to accommodate potential irritation by Mr. Payne's coworkers, though it does contain other social limitations. The RFC finds, in relevant part, that Mr. Payne can have "occasional" and "superficial" interactions with supervisors and coworkers, but no interactions with the general public. (*See* Tr. 617). The 2024 prior administrative findings opined Mr. Payne can "interact with coworkers and supervisors appropriately on a superficial basis regarding work-related activities" though he is "likely to engender irritation in others due to unreliability." (Tr. 730-731, 739-740). The RFC thus straightforwardly reflects the limitation to superficial interactions with coworkers and supervisors.

Though the RFC does not include any social limitation expressly intended to reduce potential irritation Mr. Payne's future coworkers may have, the RFC does additionally limit him to occasional interactions with supervisors and coworkers. Limiting the frequency of interactions Mr. Payne has with coworkers would help mitigate potential irritation he may engender. As the opinion expressed a speculative and future irritation by coworkers and not a specific vocational limitation, there was no error in the ALJ using more concrete terminology of "occasional" interactions. *See Thomas v. Comm'r of Soc. Sec.*, No. 3:25-cv-441, 2025 WL 2774862, at *13 (N.D. Ohio Sept. 30, 2025), *report and recommendation adopted,* 2026 WL 882833 (N.D. Ohio Mar. 31, 2026) (noting the ALJ converted a speculative opinion that the claimant "might do best with tasks he already knows well how to perform" into a concrete limitation to "work that can be learned in

30 days, or less, with simple routine tasks."). Thus, the RFC reflects the spirit of the opinion's social limitations, though it uses more concrete vocational terms, and so the ALJ was not obligated to provide any further explanation.

**C. Dr. Faust's opinion that Mr. Paye would be expected to experience difficulty with understanding, remembering, and carrying out instructions and have some limitations in persistence and work pace.**

The third omission Mr. Payne raises is Dr. Faust's opinion that he would have difficulty with understanding, remembering, and carrying out instructions and he exhibited attention deficits and a low tolerance for the stress of testing, so he would have some limitations in persistence and work pace. (ECF #10 at PageID 2197) (citing Tr. 469-70). In his January 2021 consultative report, Dr. Faust opined Mr. Payne "can be expected to experience difficulty with understanding, remembering and carrying out instructions related to ongoing symptoms of depression and PTSD" and he has "some limitations in persistence and work pace, particularly when frustrated, and he also demonstrates impairment in attention and concentration." (Tr. 469-70).

The ALJ analyzed Dr. Faust's opinion as follows:

> The opinions of the above-referenced reviewing state agency psychologist are also uncontradicted in the sense no other medical source, acceptable or otherwise, has described the claimant as having had a more restricted mental residual functional capacity since the June 12, 2020, alleged onset date. This includes a consulting psychologist who evaluated the claimant on January 5, 2021. According to this source, the claimant had problems understanding, remembering, and carrying out instructions due to depression and post-traumatic stress disorder. This source also said the claimant had some limitations with respect to persistence and work pace, and with respect to the claimant's ability to interact with others. However, this source did not offer specific work-related limitations. Although the opinion is supported by the examination, the examiner also noted the claimant's headache during the exam as affecting performance. The opinion is not fully consistent with mental status examinations showing cooperative attitude, normal speech and mood, linear, logical, and goal-oriented thought process, oriented times four, grossly intact memory, and fair to good judgment. Therefore, the opinions are not fully persuasive or probative.

(Tr. 624) (citations omitted).

The ALJ found not fully persuasive Dr. Faust's opinion that Mr. Payne "had some limitations with respect to persistence and work pace, and with respect to the claimant's ability to interact with others." To the ALJ, Dr. Faust "did not offer specific work-related limitations," Mr. Payne's "headache during the exam" affected his performance, and the opinion was "not fully consistent with mental status examinations" yielding findings the ALJ found generally benign. (*See* Tr. 624). These are each adequate explanations for why a particular limitation would not be adopted.

As discussed above, vagueness, or the failure to provide specific functional limitations, is a valid reason for rejecting an opinion. *See Quisenberry*, 757 F.App'x at 434. The limitations Mr. Payne argues were improperly ignored are that he "*can* be expected to *experience difficulty* with understanding, remembering and carrying out instructions"; has "*some limitations* in persistence and work pace;" and "*demonstrates impairment* in attention and concentration." (Tr. 469-70) (emphasis added). While terms such as "experience difficulty," "some limitation" and "impairment" each convey meaning in ordinary parlance, they are vague in the context of Social Security terminology. *See, e.g.*, *Martin v. Comm'r of Soc. Sec.*, No. 1:25-cv-17, 2026 WL 738089, at *3 (E.D. Tenn. Mar. 16, 2026) (finding "would have difficulty" performing certain tasks vague); *Hollis v. Comm'r of Soc. Sec.*, No. 1:25-cv-867, 2026 WL 41113, at *11 (N.D. Ohio Jan. 7, 2026) (finding depression "would limit" maintaining attention and concentration vague), *report and recommendation adopted,* 2026 WL 243912 (N.D. Ohio Jan. 29, 2026); *Katelyn M. v. Comm'r of Soc. Sec.*, No. 2:23-cv-12276, 2024 WL 4124675, at *10 (E.D. Mich. Sept. 9, 2024) (finding "somewhat

impaired" vague). Thus, the ALJ properly explained that the limitations from Dr. Faust's opinion were omitted because they were vague.

Next, the ALJ noted Mr. Payne's "headache during the exam" affected his performance during Dr. Faust's consultative examination. (Tr. 624). Social Security regulations require the ALJ to consider how much the record and the source's explanation supports an opinion. *See* 20 C.F.R. §§ 404.1520c(c)(1), (b)(2); 416.920c(c)(1), (b)(2). Dr. Faust noted Mr. Payne held his head and complained of increasing headache pain over the session and became frustrated and emotional when his memory or thinking were taxed. (Tr. 468). Dr. Faust was unable to administer the Wechsler Memory Scale and Mr. Payne's score on the Wechsler Adult Intelligence Scale was "extremely low" because of his headache and presumptively invalid. (Tr. 461, 467-68). The ALJ did not state any other inferences or conclusions drawn from that fact beyond observing the examination was affected. Thus, the ALJ accurately noted that Dr. Faust's examination of Mr. Payne may not be representative of his residual functional capacity because of his headache.

Third, the ALJ found Dr. Faust's opinion was "not fully consistent with mental status examinations showing cooperative attitude, normal speech and mood, linear, logical, and goal-oriented thought process, oriented times four, grossly intact memory, and fair to good judgment." (Tr. 624) (citing Tr. 1356-68). Like supportability, an ALJ must consider how much an opinion's limitations are consistent with other evidence in the record. *See* 20 C.F.R. §§ 404.1520c(c)(2), (b)(2); 416,920c(c)(2), (b)(2).

Mr. Payne argues the ALJ did not consider or cite "any of the exhibits which documented contrary findings." (ECF #10 at PageID 2199) (citing Tr. 1552, 1647). This argument is essentially that the ALJ cherry-picked the mental status examinations to justify omitting Dr. Faust's opined

limitations. Such a claim is rarely successful in the Sixth Circuit because it so often depends on finding the omitted evidence of a greater weight than the evidence that the ALJ discussed. *See DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry-picked evidence; the same process can be described more neutrally as weighing the evidence."). In the rare cases where a cherry-picking claim is successful, there is usually a misrepresentation of the record as a whole. *See, e.g.*, *Cross o/b/o K.C. v. Comm'r of Soc. Sec.*, No. 5:20-cv-2787, 2022 WL 574260, at *5 (N.D. Ohio Feb. 25, 2022).

While Mr. Payne is correct that the ALJ cited only one examination in 2021 when analyzing Dr. Faust's opinion, that does not show the ALJ cherry-picked the evidence. The ALJ discussed the numerous examination findings elsewhere in the decision and there no requirement of "tidy packaging" where the examinations must appear next to Dr. Faust's opinion; rather the court "read[s] the ALJ's decision as a whole and with common sense." *See Buckhannon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 678-79 (7th Cir. 2010). Elsewhere in the decision, the ALJ extensively cites the numerous examination findings in the record:

> The undersigned has also considered what the claimant's representative did not mention. Namely, that this record is strewn since the June 12, 2020, alleged onset date with descriptions of normal physical and mental signs to include being alert and properly oriented, and not being in distress, and to having normal breathing, normal cardiac signs, normal spinal motion, normal muscle strength, normal gait, normal moods, normal memory, normal attention and concentration normal behavior, and good insight and judgment (*see, for example*, Exs. 1F, p. 11; 2F, p. 13; 4F, pps. 4, 7, 10, and 13; 6F, pps. 2 and 4; 8F, pps. 3 and 6; 10F, pps. 43 and 60; 11F, pps. 11, 19, 21, 26, 27, 40, 41, 47, 59, and 63; 12F, pps. 5, 9, 10, and 12; 13F, pps. 7 and 10; 14F, pps. 93, 103, 114, 121, 128; 17F, pps. 11, 16, 30, 31, 37, 39, 43, 49, and 53; and 19F, pps. 9 and 15; *see also* exhibit 11E).

(Tr. 618) (citing Tr. 279, 309, 450, 453, 456, 459, 486, 488, 509, 512, 583, 600, 901, 909, 911, 916, 917, 930, 931, 937, 949, 953, 1341, 1345, 1346, 1348, 1362, 1365, 1461, 1471, 1482, 1489, 1496, 1859, 1864, 1878, 1879, 1885, 1887, 1891, 1897, 1901, 2062, 233-64). This discussion is far from perfect: some citations do not show examination findings (*see* Tr. 1345, 1346, 1348, 2062), one citation (Exhibit 19F) has no page 15, and the ALJ inexplicably cites to Mr. Payne's education records (Tr. 233-64). But the records the ALJ cites correctly document numerous mental status examinations with findings that match the ALJ's summary of the evidence that is inconsistent with Dr. Faust's opinion.

In another example, the ALJ recounted the examinations in 2024:

> More recently, on March 21, 2024, April 9, 2024, and May 6, 2024, the claimant was again described as not being in distress (*see* Ex. 11F, pps. 19, 21, and 26). The claimant was also described on April 9, 2024, and May 6, 2024, as having a normal gait and normal balance and stance (*see* Ex. 11F, pps. 19 and 26), and he was described on April 9, 2024, as being neurologically intact and as having normal lumbar motion, normal muscle strength in all four extremities, normal reflexes, and normal sensation (*see* Ex. 11F, pps. 26 and 27).

(Tr. 619) (citing Tr. 909, 911, 916-17). The ALJ then compared those to previous examinations:

> The above-described normal physical signs are also replicated in other exhibits (*see, for example*, Exs. 11F, pps. 19, 21, 26, 40, 41, 47, 59, and 63; 13F, pps. 7 and 10; 14F, pps. 93, 103, 114, 121, 128; 17F, pps. 11, 16, 30, 37, 39, 43, 49, and 53; and 19F, p. 9).

(*Id.*) (citing Tr. 930, 931, 937, 949, 953, 1362, 1365, 1461, 1471, 1482, 1489, 1496, 1859, 1864, 1878, 1885, 1887, 1891, 1897, 1901, 2062). These extensive citations show the ALJ considered the record as a whole when discussing the mental status examinations.

Mr. Payne points to two examinations as exemplars of what the ALJ ignored showing fair insight and judgment in August 2023 and poor insight and judgment and chronic suicidal ideation in September 2023. (*See* ECF #10 at PageID 2199) (citing Tr. 1552, 1647). While the ALJ

did not cite those examinations, these omissions do not overcome the ALJ's extensive discussion of the record above. An ALJ is not required to "discuss every piece of evidence in the record" for substantial evidence to support the decision. *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023). Moreover, the ALJ considered other records from mid-2023. The ALJ cited examinations in July 2023 when Mr. Payne's judgment was rated "needs improvement" and "[c]an make reasonable decisions about ordinary activities of daily living and necessary medical care recommendations" while his insight was described as "help seeking" and "good." (Tr. 619) (citing Tr. 937, 953). The ALJ also cited multiple mental status examinations in August 2023 that found Mr. Payne was "[a]lert and oriented x3, no motor deficits, speech fluent. No acute neuro deficits." (Tr. 619) (citing Tr. 1461, 1482, 1489, 1496). The court cannot decide anew which examinations taken in mid-2023 were most representative of Mr. Payne's mental state at that time. *See Brainard*, 889 F.2d at 681; *see also White*, 572 F.3d at 284 (noting cherry-picking claims "can be described more neutrally as weighing the evidence").

In sum, the ALJ adequately explained that the limitations in Dr. Faust's opinion were omitted because they were vague, Mr. Payne's headache affected Dr. Faust's examination findings, and Dr. Faust's opinion was inconsistent with mental status examinations.

## II. "Sit and squirm" test and the ALJ's personal observations

Mr. Payne argues the ALJ erred in applying a "sit and squirm" test by basing the decision on the ALJ's personal observation of Mr. Payne's ability to understand and answer questions during the hearing. (ECF #10 at PageID 2200-01). The Commissioner responds that an ALJ may rely on personal observations without amounting to an impermissible "sit and squirm" test so long as the ALJ also relies on other evidence beyond personal observation. (ECF #12 at PageID 2231-33).

When the *only* factor the ALJ relies upon in denying disability is the claimant's demeanor at the hearing, the ALJ has erred by employing the "infamous and thoroughly discredited 'sit and squirm' test." *See Martin v. Sec'y of Health and Hum. Servs.*, 735 F.2d 1008, 1010 (6th Cir. 1984). Accordingly, an "ALJ must cite some other evidence for denying a claim for pain in addition to personal observation." But that does not mean an ALJ cannot consider a claimant's observed behavior. To the contrary, a claimant's behavior at a hearing is a "material, relevant, and admissible" factor for the ALJ to consider. *Sorrell v. Comm'r of Soc. Sec.*, 656 F.App'x 162, 171-72 (6th Cir. 2016). Social Security regulations also state the agency considers "other evidence" in evaluating a claimant's symptoms, including, among other things "observations by our employees and other persons." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Here, the ALJ did rely on personal observations of Mr. Payne's behavior in the hearings, but those observations were not the *sole* consideration. As Mr. Payne recounts, "the ALJ used five pages to detail symptoms and conclusions," some of which contained personal observations of him. (ECF #10 at PageID 2200) (citing Tr. 614-16, 621-22). In those cited pages, the ALJ laid out 61 bullet points (many duplicative) of evidence describing whether Mr. Payne's mental conditions met or equaled a listing and supporting the mental RFC. (Tr. 614-16, 621-22). Of the 34 bullet points provided at Step Three, 12 are personal observations of Mr. Payne by the ALJ or other agency employees about his ability to understand and answer questions, interact adequately, concentrate (one of which was repeated twice), and manage stress during claims interviews and two hearings. (*See* Tr. 614-16). The other 22 bullet points detail Mr. Payne's statements, his daily activities, and his treatment records. (*Id.*). Of the 27 bullet points provided at Step Four, all 12 personal observations (complete with the duplicate) reappear alongside findings about Mr. Payne's

statements, the lack of complaints to treatment providers, and his treatment records. (*See* Tr. 621-22). In addition to those bullet points, the ALJ provided pages of other analysis of the treatment records (Tr. 618-20), daily activities (Tr. 620), and opinion evidence (Tr. 623-25).

Thus, while the ALJ did consider personal observations of Mr. Payne in deciding his claim, the ALJ did so as one part of an extensive discussion of several types of evidence. The mere presence of personal observations does not mean the ALJ automatically applied an impermissible "sit-and-squirm" test; rather the ALJ discharged the administrative function of considering the entire record and using that to determine Mr. Payne's RFC.

I thus decline to recommend remand on this basis.

**III. Evaluation of migraine headaches and TBI at Step Three**

Last, Mr. Payne argues that at Step Three the ALJ misevaluated his migraine headaches and TBI. (ECF #10 at PageID 2202-08). The Commissioner responds that the ALJ properly evaluated Mr. Payne's migraines under the appropriate listing and substantial evidence supported the finding that he did not medically equal the listing. (ECF #12 at PageID 2233-36). The Commissioner also contends the ALJ properly evaluated the appropriate listing for TBI and Mr. Payne's argument amounts to an impermissible invitation to reweigh the evidence. (*Id.* at PageID 2237). Mr. Payne replies his headaches were frequent enough to meet the requirements of the listing and the Commissioner's arguments amount to an impermissible post-hoc rationalization. (ECF #13 at PageID 2242).

At Step Three, a claimant will be found disabled if the claimed impairment meets or equals one of the listings in the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1526, 416.920(a)(4)(iii), 416.926; *Turner v. Comm'r of Soc. Sec.*, 381 F.App'x. 488, 491 (6th Cir. 2010). The Listing of Impairments in Subpart P, Appendix 1 of the regulations describes impairments the

Commissioner considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). An impairment medically equals a listed impairment when "it is at least equal in severity and duration to the criteria of [the] listed impairment." *Id.* §§ 404.1526(a), 416.926(a). Medical equivalency can be found by comparing the factual findings regarding a claimant's impairment with a closely analogous listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2).

When considering whether a claimant's impairment meets or equals a listed impairment, an ALJ must evaluate the evidence, compare it to the relevant listed impairment, and give an explained conclusion to facilitate meaningful judicial review, without which is it impossible to say whether substantial evidence supports the ALJ's decision at Step Three. *Reynolds v. Comm'r of Soc. Sec.*, 424 F.App'x. 411, 416 (6th Cir. 2011). The ALJ need only analyze the relevant listing when the record "raises a substantial question as to whether [the claimant] could qualify as disabled" under a listing. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.App'x 426, 432 (6th Cir. 2014). To raise a substantial question, the claimant must point to specific evidence demonstrating she reasonably could meet or equal every requirement of the listing. *Id.*

**A. The record did not present a substantial question whether Mr. Payne's migraine headaches medically equaled the listing for epilepsy.**

Migraine headaches are not a listed impairment but, under Social Security Ruling 19-4p, headaches can medically equal the most closely analogous listed impairment of epilepsy, governed by paragraphs B and D of Listing 11.02. *See* SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019). "Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment" while "Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3

consecutive months despite adherence to prescribed treatment and marked limitation in one area of functioning." *Id.*, 2019 WL 4169635, at *7. To evaluate whether a claimant's headaches are equal in severity and duration to dyscognitive seizures in Listing 11.02(B) and (D), the ALJ considers:

> A detailed description from an [accepted medical source] of a typical headache event, including all associated phenomena (for example premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).
>
> * * *
>
> [W]e also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

*Id.* The Listings define the phrase "despite adherence to prescribed treatment" to mean that "you have taken medication(s) or followed other treatment procedures for your neurological disorder(s) as prescribed by a physician for three consecutive months but your impairment continues to meet the other listing requirements despite this treatment." *See* Listing 11.00(C), 20 C.F.R. Pt. 404, Subpt. P, App'x 1.

I note as an initial matter, the ALJ did not make findings specifically about Mr. Payne's migraines at Step Three but did make general findings about the severity of the mental limitations he faced. (*See* Tr. 613-16). In the ALJ's defense, in his prehearing brief Mr. Payne did not specifically argue (nor waive) whether his migraines medically equaled a listing and at the start of the hearing Mr. Payne stated "I'm not making a Step Three argument." (*See* Tr. 889, 674). While

this does not operate as a forfeiture of the issue, as the ALJ made findings at Step Three, it also does not mean the ALJ necessarily erred by not specifically addressing Mr. Payne's migraines. *See Wells v. Comm'r of Soc. Sec.*, No. 1:22-cv-1969, 2023 WL 7923863, at *8-9 (N.D. Ohio Oct. 13, 2023) (noting that while there is no forfeiture despite the listings not being expressly raised before the ALJ because the ALJ addressed other listings, at the same time the ALJ was not obligated to specifically address a particular listing), *report and recommendation adopted,* 2024 WL 1340187 (N.D. Ohio Mar. 29, 2024). This is so because the ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of Soc. Sec.*, 544 F.App'x 639, 641 (6th Cir. 2013). The ALJ should discuss the relevant listing, however, where the record raises "a substantial question as to whether [the claimant] could qualify as disabled" under a listing. *Smith-Johnson,* 579 F.App'x at 432. To raise a substantial question as to whether a claimant satisfied a listing, the claimant must point to specific evidence that shows he reasonably could meet or equal every requirement of the listing. *Id.* "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.

The record does not raise a substantial question whether Mr. Payne's headaches are medically equal in severity to epilepsy under Listing 11.02. Mr. Payne points to a diagnosis of post-traumatic headaches in July 2023 for which he was prescribed sumatriptan and then he complained of headaches in August, October, and December 2023 as well as March, May, and July 2024. (ECF #9 at PageID 2202) (citing Tr. 950, 956, 1463, 921, 1732, 919, 910, 908, 899). In July 2023, Mr. Payne complained of headaches, reported taking medications, and was prescribed sumatriptan. (Tr. 923, 950, 956). He reported increasing headaches in August 2023 and his

Imitrex (a brand-name for sumatriptan) was temporarily effective. (Tr. 1463). But by October 2023, Mr. Payne "still had daily headaches" but he "has not been on his regular Sumatriptan or Inderal." (Tr. 921). While Mr. Payne was experiencing significant personal hardship at the time, he nonetheless was not adhering to his prescribed headache treatment. (*See* Tr. 921). The note from December 2023 is a CT scan result that recounts "HISTORY: Blunt trauma, sudden severe headache" but does not indicate whether Mr. Payne was experiencing headaches at that time or if the note merely described his symptoms in June 2023 after he was assaulted and struck in the head multiple times. (*See* Tr. 1732; *see also* Tr. 1585).

In January 2024, Mr. Payne reported daily headaches during a physical therapy appointment. (Tr. 2112). The note does not state anything about whether he took his medications and states "no known medications." (Tr. 2113). Then on March 7, 2024, Mr. Payne complained he still experienced "a lot of headaches and pressure across his face" and he reported "has not been on the amitriptyline [Elavil] in some time either" so his doctor planned "we will go back on propranolol" and "will use Elavil" for headaches, as well as other conditions. (Tr. 919). This indicates Mr. Payne was no longer taking his headache medications before March 7, 2024 as they had been previously prescribed in March 2021. (*See* Tr. 535 ("We will try Elavil"), 538 ("Patient was started on propranolol and sumatriptan for headaches")). Mr. Payne endorsed headaches on April 9, 2024 (Tr. 910) and reported about three headaches per week on May 7, 2024 (Tr. 908). But by June 17, 2024, he reported he "sometimes gets some he[ad]aches." (Tr. 901). In December, he reported his "migraines are also doing well." (Tr. 2069).

To be sure, these records show Mr. Payne suffered chronic headaches despite treatment, but they do not raise a substantial question whether those headaches medically equaled all the

requirements for epilepsy Listing 11.02(B) or (D). *See Smith-Johnson*, 579 F.App'x at 433. To start, SSR 19-4p requires a "detailed description from an [accepted medical source] of a typical headache event," including all associated phenomena, the frequency of headache; adherence to prescribed treatment, side effects of treatment, and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment. *See* 2019 WL 4169635, at *7. Mr. Payne does not direct the court to such a statement nor does one appear in the record. The closest is Dr. Faust's 2021 consultative psychological opinion where Mr. Payne was experiencing a headache during the examination as that opinion reveals some of the limitations in functioning Mr. Payne faces during a headache, but that opinion does not describe any associated phenomena, headache frequency, or the compliance with and side effects of treatment. (*See* Tr. 461, 468-70). Moreover, Dr. Faust's opinion does not describe Mr. Payne's condition during March through June 2024, the only period when Mr. Payne complained of headaches despite treatment. (*See* Tr. 919, 910, 908, 901). The consultative examination that described Mr. Payne's status in August 2024 did not mention any issues from headaches. (*See* Tr. 2052-53). Without any of this evidence, the ALJ had nothing to determine whether Mr. Payne's headaches were medically equal in severity and duration to dyscognitive seizures so as to equal Listing 11.02. *See* SSR 19-4p, 2019 WL 4169635, at *7.

Were the required detailed description present in the record, the record could raise a substantial question whether Mr. Payne's headaches medically equaled the listing. Over the period from March through June 2024, Mr. Payne restarted his medications in March and he complained of headaches, worsening to three per week in May until improving to "sometimes" having "some headaches." (*See* Tr. 919, 910, 908, 901). While these notes suggest his headaches persisted despite

treatment during March through June 2024 and were of the required frequency in May, those records mentioned no other characteristic required by SSR 19-4p to raise a substantial question.

Mr. Payne's contention that the above amounts to an improper post-hoc rationalization for the ALJ lacks merit. The Commissioner's "decision must be affirmed on the grounds noted in the decision" and not on after-the-fact justifications. *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (6th Cir. 1993) (table). True, the ALJ did not go through Mr. Payne's treatment records and explain how they did not suffice under SSR 19-4p. But the ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks*, 544 F.App'x at 641. As the Sixth Circuit puts it, there is "a fine line" between an improper post-hoc rationalization and a determination the record does not raise a substantial question that a claimant meets a listing. *See Smith-Johnson*, 579 F.App'x at 435. Here, Mr. Payne did not put forward before the ALJ that his headaches medically equaled Listing 11.02 (*See* Tr. 889, 674) (each eschewing a step-three argument in favor of other arguments). The only evidence that his headaches medically equaled the listing for epilepsy was that his headaches persisted despite treatment for three months in 2024 and in one of those months, his headaches had sufficient frequency. (*See* Tr. 919, 910, 908, 901). But there was no other evidence establishing any of the other factors that allow an ALJ to determine whether Mr. Payne's headaches were equal in severity and duration to dyscognitive seizures under Listing 11.02. *See* SSR 19-4p, 2019 WL 4169635, at *7. Thus, while the ALJ did not address whether the evidence met SSR 19-4p, the "conclusion that the record evidence does not raise a substantial question" is not automatically a post-hoc rationalization. *See Smith-Johnson*, 579 F.App'x at 435.

Mr. Payne's contention that the ALJ "failed to acknowledge the relevant factors or discussion of daily activities, the location etc. of her [sic] headaches, the effectiveness of her [sic] treatment for headaches, any measures taken to relieve her [sic] pain, and the limiting effects of her [sic] headaches" also lacks merit. (*See* ECF #10 at PageID 2203). Mr. Payne relies on *Harper v. Comm'r of Soc. Sec.*, No. 1:20-cv-1304, 2021 WL 2383833, at *12 (N.D. Ohio May 25, 2021) in support, but the cited page addresses the ALJ's evaluation of a claimant's statements at Step Four—it does not apply to the analysis at Step Three. No Step Three errors were raised in *Harper*. The argument also directly invokes the factors that guide an ALJ's evaluation of a claimant's statements about his or her own symptoms. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017). As Mr. Payne's counsel is no doubt aware from the multiple warnings, it is improper to "combin[e] together disparate challenges and arguments of the sequential disability evaluation." *See Elledge v. Comm'r of Soc. Sec.*, No. 1:23-cv-1979, 2024 WL 3237455, at *6 (N.D. Ohio Apr. 9, 2024) (collecting cases), *report and recommendation adopted,* 2024 WL 3228390 (N.D. Ohio June 28, 2024). That Mr. Payne's counsel misgenders Mr. Payne four times in that sentence and mentions "pain" when the rest of the sentence focuses on headaches suggests this was a simple cut-and-paste error and not a developed, yet improper, argument. (*See* ECF #10 at PageID 2203). If this was intended as a discrete argument, such an argument is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

### B. The record does not present a substantial question that Mr. Payne's traumatic brain injury meets Paragraph A of Listing 11.18 and substantial evidence supports the ALJ's determination that he does not meet Paragraph B of the Listing.

Mr. Payne also argues his TBIs met the requirements of Listing 11.18 because he has marked limitations in both physical functioning and the mental-functioning areas of understanding, remembering, or applying information and adapting or managing oneself. (*See* ECF #10 at PageID 2203-04). The Commissioner responds that Mr. Payne's argument amounts to an impermissible request to reweigh the evidence and redetermine his limitations de novo. (*See* ECF #12 at PageID 2237).

Listing 11.18 applies to TBIs, characterized by one of the following:

> A. Disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the injury; or
>
> B. Marked limitation in physical functioning, and in one of the following areas of mental functioning, persisting for at least 3 consecutive months after the injury):
>
> 1. Understanding, remembering, or applying information;
> 2. Interacting with others;
> 3. Concentrating, persisting, or maintaining pace; or
> 4. Adapting or managing oneself.

*See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 11.18.

#### 1. Paragraph B

I begin with paragraph B of Listing 11.18 because the ALJ made specific findings for that paragraph:

> To the above point, the claimant's physical impairments have not caused, over any continuous 12-month period since the June 12, 2020, alleged onset date, the types

> of problems described in Listings 1.15, 4.11, and 11.18. Nor is there evidence of a listing-level mental impairment(s). In part, this is because there is no evidence the claimant's mental impairments have caused, over any continuous 12-month period since the June 12, 2020, alleged onset date, a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. The claimant's mental impairments also have not caused, over a continuous 12-month period since June 12, 2020, an extreme limitation of one, or marked limitation of two, of the four areas of mental functioning which are: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. Rather, the claimant's mental impairments have caused no more than moderate limitations on these areas . . .

(Tr. 613-14).

The ALJ then made 34 bullet points of factual findings covering the four areas of mental functioning, of which 17 are relevant to Mr. Payne's challenge that he is markedly limited in understanding, remembering, or applying information and adapting or managing oneself:

- The claimant has not complained to treating medical sources since the June 12, 2020 alleged onset date of ongoing marked or extreme problems understanding, remembering, or applying information.
- The claimant's treatment records since the June 12, 2020, alleged onset date do not document ongoing marked or extreme problems he has been observed to have understanding, remembering, or applying information.
- The claimant was able to understand and answer questions during a September 8, 2020 claims representative interview.
- The claimant has been described as having average intelligence, and there is no evidence since the June 12, 2020 alleged onset date that depicts the claimant as having an intellectual disability aside from intelligence testing on January 5, 2021, where his performance was affected by a headache.
- The claimant was able to understand and answer questions during his August 24, 2022 and April 9, 2025 hearings.
- The claimant has been described on different occasions since the June 12, 2020 alleged onset date as having an intact memory.
- The claimant has been able to understand information about his impairments and medical treatment since the June 12, 2020 alleged onset date.

- The claimant's treatment records since the June 12, 2020 alleged onset date show he has been able to understand and answer questions about his health.
- Since the June 12, 2020 alleged onset date, the claimant has spent some of his time reading and watching television, activities that require some ability to understand, remember, and apply information; so does shopping and managing money.

* * *

- The claimant has not complained to treating sources since the June 12, 2020 alleged onset date of ongoing marked or extreme problems adapting to changes or managing his affairs because of a mental impairment(s).
- The claimant's treatment records since the June 12, 2020 alleged onset date do not document ongoing marked or extreme problems he has been observed to have adapting to changes or managing his affairs because of a mental impairment(s).
- As above, since the June 12, 2020 alleged onset date, the claimant has been able to take care of his personal needs, shop in stores, read, manage money, and watch television. The claimant also engaged in substantial gainful activity in 2021 and 2022.
- The claimant was able to manage the stress associated with the above-mentioned claims representative interview on September 8, 2020.
- The claimant was able to manage the stress associated with his August 24, 2022 hearing.
- The claimant was able to manage the stress associated with his April 9, 2025 hearing.
- The claimant has received relatively little outpatient mental health counseling since the June 12, 2020 alleged onset date.
- The claimant has not been psychiatrically hospitalized aside from the inpatient alcohol and drug rehabilitation he had between the June 12, 2020 alleged onset date and July 6, 2020.

(Tr. 613-16) (cleaned up).

Mr. Payne does not acknowledge or challenge this discussion. Rather, Mr. Payne discusses extensively over about five pages the evidence that supports marked limitations in physical

functioning and in understanding, remembering, or applying information and adapting or managing oneself. (*See* ECF #10 at PageID 2204-08). But even if the Court found that the evidence Mr. Payne marshals shows he has a listing-level impairment, substantial evidence would still support the ALJ's Step Three finding and the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. At bottom, Mr. Payne's argument is a request to reweigh the evidence and find he is markedly limited, which this Court cannot do. *Brainard*, 889 F.2d at 681.

**2. Paragraph A**

The ALJ did not address Paragraph A of Listing 11.18 and marked limitations in mental functioning are not required to meet its requirements so the ALJ's discussion of Paragraph B is immaterial. Rather, a claimant must have "disorganized motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities" *See* 20 C.F.R. Part 404, Subpt. P, App'x 1, § 11.18(A). Because the ALJ did not address Paragraph A, Mr. Payne must raise a substantial question by advancing specific evidence demonstrating he reasonably could meet or equal every requirement of that paragraph. *Smith-Johnson,* 579 F.App'x at 432.

Mr. Payne does not advance any evidence raising a substantial question whether he had a "disorganized motor function in two extremities" nor "an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities. Listing 11.00(D)(1) defines "disorganization of motor function" to mean "interference, due to your neurological disorder, with movement of" both upper or both lower extremities. *See* 20 C.F.R. Part 404, Subpt. P, App'x 1, § 11.00(D)(1). The closest evidence he advances showing "disorganization of motor function in two extremities" is that "he used the cane every day to move around and

when standing." (ECF #10 at PageID 2207) (citing Tr. 684). While Mr. Payne's use of a cane was mentioned in the 2024 consultative examination (*see* Tr. 2051), and some records document poor coordination (Tr. 279), the record also contains numerous physical examinations noting a normal range of motion, muscle strength, and gait (*see, e.g.*, Tr. 308-09, 453, 930-31, 937, 949, 953, 1461 ("musculoskeletal: [moves all extremities] x4 . . . normal ROM. Steady gait."), 1471, 1482, 1489, 1496, 916-17, 911-12, 902 ("musculoskeletal: [moves all extremities]" "5/5 strength [both upper extremities]"), 1344) (ordered chronologically).

Similarly, the record does not show he was "extremely limited in his ability to stand up, maintain balance while walking, or use his upper extremities." *See* 20 C.F.R. Part 404, Subpt. P, App'x 1, § 11.18(A). Mr. Payne advances considerable evidence about his back pain. (*See* ECF #10 at PageID 2205-06). While that evidence shows he faces limitations, it does not raise a substantial question if he meets Listing 11.18(A)'s requirement that he be extremely limited in standing up, balancing while walking, or using his upper extremities. Listing 11.00(D)(2) defines "extreme limitation" to mean "the *inability* to stand up" or "maintain balance" while standing or walking "without the assistance of another person or the use of an assistive device, such as a walker, two crutches, or two canes" or "a loss of function of both upper extremities . . . that very seriously limits your ability to" perform fine and gross motor movements. 20 C.F.R. Part 404, Subpt. P, App'x 1, § 11.00(D)(2) (emphasis added). Various examinations document normal balance, gait, and stance as well as full muscle strength in his upper extremities. (*See, e.g.*, Tr. 308-09, 453, 930-31, 937, 949, 953, 1461, 1471, 1482, 1489, 1496, 916-17, 911-12, 902, 1344). Mr. Payne does not advance any evidence showing he was limited in fine or gross manipulation, nor did any medical

source opine he was limited in those abilities. (*See* Tr. 69-70, 725-26, 729-30). Thus, Mr. Payne has not raised a substantial question that he meets either requirement of Listing 11.18(A).

I thus decline to recommend remand on this basis.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: September 10, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The**

failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).